630 A.2d 801

VICTOR M. STARR AND HEIDI STARR, PLAINTIFFS–APPELLANTS, v. JOEL J. REINFELD, DEFENDANT–RESPONDENT DONALD O. REYNOLDS, JR.; PATRICIA L. REYNOLDS; THOMAS G. JOHNSON; LIBERTY 100 REALTY, A NEW JERSEY CORPORATION; KIM VILLANO; ROBERT J. MURPHY REALTY, INC. D/B/A MURPHY REALTY/BETTER HOMES AND GARDENS, A NEW JERSEY CORPORATION; AND JOSEPH R. AGNER, D/B/A EXECUTIVE CONSULTANTS, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued May 5, 1992—Decided August 4, 1993.

Before Judges KING, BRODY and HUMPHREYS.

*Catherine E. Brown* argued the cause for appellant (*Chapman, Henkoff, Kessler, Peduto & Saffer,* attorneys; *Leonard A. Peduto, Jr.,* on the brief).

*Robert G. Klinck* argued the cause for respondent (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys; *Mr. Klinck,* on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

We granted leave to appeal in this case, *R.* 2:2–3(b); *R.* 2:2–4, to examine the ruling of the Law Division judge which granted absolute judicial immunity from claims by third-parties to an attorney designated by a Family Part judge to sell a home owned by litigants in a marital dissolution proceeding. The purchasers of the property sued the attorney claiming that he knowingly misrepresented or concealed certain structural defects from them. We

conclude that the attorney was not entitled to the shield of traditional absolute judicial immunity afforded to common-law judges in this suit for damages brought by allegedly wronged purchasers of real estate. We reverse the grant of summary judgment on judicial immunity grounds in the attorney's favor.

## I

This appeal stems from a divorce action filed in the Family Part, Chancery Division in Bergen County in 1989 captioned Patricia L. Reynolds v. Donald O. Reynolds, Docket No. FM–15767–89. On December 22, 1989 a Family Part judge appointed defendant Joel J. Reinfeld, Esquire, an attorney, "to forthwith sign the listing agreement and all necessary papers to sell the marital home at 84 Deerhaven Road, Mahway, New Jersey, at the best price possible and under the best listing terms." The order also provided that Reinfeld was "immune from liability from either party because of his appointment by this court." The marital property subject of the equitable distribution of the martial estate was a two-story "Georgian-colonial" home built during the 1970's.

Attorney Reinfeld's certification in support of his motion for summary judgment in November 1992 discloses the factual background relevant to his claim of absolute immunity in the suit by the purchasing plaintiffs, the Starrs, for damages. Reinfeld listed the property for sale with an agent in January 1990 at $539,500, after he asked three real estate agents to survey the property. In April 1990 he reduced the price to $499,500. On August 13, 1990 he listed the property with a different agent and eventually further reduced the price to $469,500. In March 1991 he received an offer of $350,000. He rejected this offer. Reinfeld then received permission by the judge to have the house appraised. On April 8, 1991 the appraised value was $375,000.

During July 1991 Reinfeld received two offers: one from Timothy Tuttle, an attorney, and one from the plaintiffs, Victor and Heidi Starr. Reinfeld accepted Tuttle's offer to purchase the home for $355,000. On July 31 Tuttle sent Reinfeld a letter

modifying the contract of sale. The letter also stated that Tuttle would have the house inspected on August 2, 1991. Reinfeld replied that he told Tuttle that the sale was "as is" since the agreed price was $20,000 below the appraised value.

On August 1, 1991 Reinfeld sent the Family Part judge who appointed him to sell the house a certification in support of a motion to approve the sale of the house to Tuttle for $355,000. Reinfeld said that although he did not think that court approval was necessary, he filed the motion because he thought that the Reynolds, the divorcing owners, might be unsatisfied with the price. The certification on this application for approval contains the only reference in the record to Reinfeld's manner of compensation. This certification of August 1, 1991 stated:

> I also respectfully request that this Court approve the payment of my attorney's fees off the top of the sale proceeds after payment of appropriate liens and real estate commissions etc. I will present a final bill to be approved by the Court prior to closing. Additionally, my usual and customary fee for a real estate sale is $650.00 for processing all papers and attending closing.

Reinfeld's counsel could not further enlighten us at oral argument on the extent of his anticipated compensation, whether hourly or otherwise, in addition to his $650 closing fee. The record is silent on the point.

On August 2, 1991 Tuttle called Reinfeld and told him that an inspection of the house revealed structural defects and he was canceling the contract. Apparently, no written report of this inspection was forwarded to Reinfeld. In his brief Reinfeld states: "At that time, [Tuttle] may or may not have told Reinfeld that such repairs involved a beam of the house. Reinfeld really did not care about the nature of the [necessary] repairs as there were no signed riders and Tuttle could have canceled the contract for any reason." On the same date, August 2, Tuttle sent Reinfeld a letter canceling the sale because the inspector told him "significant repairs" were required.

Sometime in early August 1991 Reinfeld decided to accept the plaintiffs Starrs' offer of $350,000. On August 5 Reinfeld signed a blank copy of a property settlement history form and sent it to

Donald Reynolds for completion. Reynolds completed the form and signed it on August 13, 1991; Reinfeld signed the contract of sale as "seller" with the Starrs on that date. On August 15, during the attorney review period, the Starrs' attorney proposed six minor amendments to the contract. Reinfeld accepted all of them.

On August 21 defendant Joseph R. Agner, d/b/a Executive Home Consultants, inspected the house for the Starrs. On August 26 the Starrs' attorney sent Reinfeld a letter outlining the problems discovered by Agner and a copy of the written report of the inspection (which never mentioned structural defects in support beams). On September 19, 1991 Reinfeld agreed to reduce the price to $348,500, after extensive negotiations. The closing took place on December 9, 1991 in Reinfeld's office. Reinfeld never sought judicial approval of the sale.

After closing and moving into the house, the Starrs claimed that certain structural defects became manifest. In their complaint filed on June 12, 1992 against the Reynolds, Reinfeld, the listing and selling agents, and the inspection company, the Starrs alleged:

13. The Structural Defects include, but are not limited to, the improper design and/or construction of the main interior support girder for the first floor and the installation of an auxiliary system to stabilize the main interior support girder which, alone or together, have materially and adversely affected the entire structural integrity of the Property by causing, or contributing to, a sagging and/or progressive collapse of the roof, interior ceilings, floors and walls, and other fixtures and appurtenances.

14. The Structural Defects were latent in character, and not readily observable by, or known to, the Starrs prior to the closing and conveyance of title.

15. Defendants Reynolds had knowledge of the Structural Defects, and/or of the effects thereof, prior to entering into the Contract and executing and delivering the Deed.

The four counts of the complaint demanding judgment against Reinfeld were for claims of: intentional misrepresentation (count six), intentional concealment of material facts (count seven), negligent misrepresentation (count eight), and attorney malpractice (count nine).

On October 8, 1992 Reinfeld moved for summary judgment. He contended that since he was appointed to sell the property by the Family Part of the Chancery Division, he was entitled to absolute judicial immunity. He claimed that he was a "court-appointed conduit for the sale" of the house, not the actual "seller" of the property. On November 20, 1992 the Law Division judge granted summary judgment in favor of Reinfeld on the ground of absolute judicial immunity as a "quasi-judicial official," relying on *Delbridge v. Schaeffer*, 238 *N.J.Super.* 323, 340, 569 *A.*2d 872 (Law Div.1989). The judge concluded that "a denial of quasi-judicial immunity would certainly deter qualified individuals from agreeing to serve in any quasi-judicial appointments of the court" and "deny judges these valuable resources." No discovery had taken place on the merits of the Starrs' claims. The ruling was solely on the immunity ground.

## II

There are two contending views of Reinfeld's status presented by this appeal. He can be viewed as a court-appointed attorney or agent, similar to a "pool" attorney appointed in criminal cases where the Public Defender has a conflict, performing an essentially private or personal function, here representing the private interests of the Reynolds in the sale of their former marital home. This is the view of the plaintiffs, the Starrs. Or Reinfeld can be viewed as a type of court-appointed administrator somehow performing a judicial decision-making function and partaking in the judge's common-law immunity.

We think that our course for decision is substantially charted by our Supreme Court's holding in *Levine v. Wiss & Co.*, 97 *N.J.* 242, 478 *A.*2d 397 (1984) (4–3 decision). The Court there held accountants selected by the litigants in a contested matrimonial case and appointed by the court to act as an "impartial expert" to render a binding evaluation of a business asset for purposes of equitable distribution, were not immune from a damage suit by the ex-husband for negligence in deviating from accepted standards of

the accounting profession. *Id.* at 244, 478 *A.*2d 397. The defendants-accountants claimed judicial immunity because the court appointment supposedly "elevated them beyond the status of accountants to the quasi-judicial role of 'arbitrators....'" *Id.* at 247, 478 *A.*2d 397. The majority thought the accountants should more appropriately be considered as appraisers and held to the standards of their skilled professions. *Id.* at 248, 251, 478 *A.*2d 397. Their role was not quasi-judicial in character, like arbitrators who do enjoy immunity when making decisions and awards. *Id.* at 250, 478 *A.*2d 397. The accountants in *Levine* "did not exercise the discretionary judgment that is the hallmark of the arbitrator's function." *Id.* at 251, 478 *A.*2d 397. The majority opinion by Justice Handler cautioned: "A court-appointment is not a talisman for immunity." *Id.* at 252, 478 *A.*2d 397.

The minority opinion, by Justice O'Hern in *Levine,* urged immunity for the accountant-evaluators serving the court and the parties because he "believe[d] it weakens such systems to look for fine distinctions that make the dispute-resolver subject to lawsuits by disgruntled participants." *Id.* at 256, 478 *A.*2d 397. The minority opinion reasoned that denial of immunity would discourage alternative dispute resolution.

A recent attempt to extend judicial immunity to court reporters in a suit for damages for delay in providing a trial transcript was blunted by a unanimous federal Supreme Court in *Antoine v. Byers & Anderson, Inc.,* —— *U.S.* ——, 113 *S.Ct.* 2167, 124 *L.Ed.*2d 391 (1993) (June 7, 1993). The Supreme Court, through Justice Stevens, declared that: "The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity." *Id.* at ——, 113 *S.Ct.* at 2169, 124 *L.Ed.*2d at 396, citing *Burns v. Reed,* 500 *U.S.* ——, 111 *S.Ct.* 1934, 114 *L.Ed.*2d 547 (1991) ("We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant.").

Justice Stevens described the scope of and imperative for common-law absolute judicial immunity this way:

The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." [*Burns v. Reed,*] 500 *U.S.,* at ——[, 111 *S.Ct.* at 1946] (Scalia, J., concurring in judgment in part and dissenting in part). When judicial immunity is extended to officials other than judges, it is because their judgments are "function-al[ly] comparab[le]" to those of judges—that is, because they, too, "exercise a discretionary judgment" as a part of their function. *Imbler v. Pachtman,* 424 *U.S.* [409], at 423, n. 20[, 96 *S.Ct.* 984, at 991, n. 20, 47 *L.Ed.*2d 128].

*Antoine, supra,* —— *U.S.* at ——, 113 *S.Ct.* at 2171, 124 *L.Ed.*2d at 398.

We agree. We conclude that Reinfeld's role in this transaction did not entitle him to absolute judicial immunity. He performed none of the traditional discretion, decision-making functions of a judge. Though apparently court-selected and surely court-appointed, he dealt with the general public in attempting to sell real estate which the embattled parties could not efficiently undertake to sell themselves. Reinfeld did not make quasi-judicial decisions in the cloister of an alternative court-room. He became an alter-ego for the disputing parties in a very competitive real estate market. He was presumably paid the prevailing commercial rate for his services. Reinfeld did not seek, and did not need to seek, court-approval for the sale of the Reynolds' property to the Starrs.

The claim here by the Starrs was not made by disgruntled litigants. The claim was made by members of the consuming public. The claim is not that Reinfeld's judgment as to the rights of the disputing parties was askew or an abuse of discretion. If this were so, such error could have been corrected by the Family Part judge or the appellate process. The claim here is that Reinfeld wronged bona fide purchasers of real estate either intentionally or by his manifest indifference to their legitimate concerns. *See Weintraub v. Krobatsch,* 64 *N.J.* 445, 317 *A.*2d 68 (1974). Reinfeld acted, in effect, as a real estate broker, a quite legitimate undertaking for a New Jersey attorney when incidental to the practice of law. *See N.J.S.A.* 45:15–4; *Spirito v. New*

*Jersey Real Estate Comm'n,* 180 *N.J.Super.* 180, 189, 434 *A.*2d 623 (App.Div.1981).

We find that for purposes of reviewing this order for summary judgment, and on the pleadings and certifications available to us, that Reinfeld was not, as he suggests, a "mere conduit" for the transfer of the property. As appellant points out, since *Palys v. Jewett,* 32 *N.J.Eq.* 302 (E. & A. 1880), a receiver has been subject to an action at law for his torts in his representative capacity. The high standards governing court-appointed receivers in the sale of property under their supervision were recited in *In re New Jersey Refrigerating Co.,* 100 *N.J.Eq.* 537 (E. & A.1927), a decision setting aside a sale of real estate because of innocent misrepresentations by the receiver's auctioneer:

> The description of the property offered for sale should be described in language so clear and unambiguous that persons of ordinary understanding will not be deceived as to either its character or identity. A misdescription, in a material matter, upon which the purchaser might reasonably rely, and did rely to his damage, is ground for avoidance of the contract. This is so even though the conditions of sale provide that errors and misdescription shall not avoid the contract.
>
> This rule [requiring a clear, careful description of the attributes of the property] should be strictly adhered to, when officers of the court representing the court are dealing with the public, otherwise the court may be a subject of just criticism. This is especially so when the object of all such imputations may and can be completely and entirely removed by a degree of care and supervision on the part of the receivers before the property is offered for sale. It is their business, when dealing with the public, in the name of the court, to observe a high degree of accuracy in all statements intended to influence bidders at an auction sale of real estate. [*Id.* at 540.]

Reinfeld relies in substantial part on cases where receivers or conservators appointed to sell marital real estate were held immune from suits by the disputing parties to the marital litigation. *See Cok v. Cosentino,* 876 *F.*2d 1 (1st Cir.1989); *Ashbrook v. Hoffman,* 617 *F.*2d 474 (7th Cir.1980); *Wagshal v. Foster,* 1993 *WL* 84699 (D.D.C.1993). These cases should not control situations where the claim is asserted by bona fide purchasers in the market place, like the Starrs.

We find nothing in our jurisprudence to suggest that the doctrine of judicial immunity should be extended to an attorney

appointed by a judge to sell real estate for the parties. The attorney here was compensated for undertaking a standard commercial transaction. He did not decide anyone's rights. We have nothing before us on the merits of the dispute and, of course, imply no outcome in that regard.

Reversed.