**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0370-21

CHANA RINGEL and
CR LAKEWOOD, LLC,
individually and derivatively
on behalf of BCR LAKEWOOD
HOLDINGS, LLC,

     Plaintiffs-Respondents,

v.

BR LAKEWOOD, LLC and
BENJAMIN RINGEL,

     Defendants-Appellants.

_____

CHANA RINGEL, individually
and derivatively on behalf of
BCR OAKRIDGE, LLC,

     Plaintiffs-Respondents,

v.

BENJAMIN RINGEL and SUNSET
HILL OAKRIDGE PLAZA, LLC,

     Defendants-Appellants.

_____

RUSHMORE CAPITAL, LLC,

      Intervenor-Respondent.

_____

Submitted September 12, 2022 – Decided October 20, 2022

Before Judges Currier and Mayer.

On appeal from the Superior Court of New Jersey, Chancery Division, Ocean County, Docket Nos. C-000127-15 and C-000152-16.

Patterson Belknap Webb & Tyler LLP, attorneys for appellants (Peter C. Harvey, on the briefs).

Giordano, Halleran, Ciesla, PC, and Koffsky Schwalb, LLC, attorneys for respondents Chana Ringel, individually and derivatively on behalf of BCR Oakridge, LLC, and CR Lakewood, LLC, individually and derivatively on behalf of BCR Lakewood Holdings, LLC (Matthew N. Fiorovanti and Efrem Schwalb, on the brief).

Troutman Pepper Hamilton Sanders, LLP, and Avrohom C. Einhorn (Troutman Pepper Hamilton Sanders, LLP) of the Pennsylvania bar, admitted pro hac vice, on behalf of respondent Rushmore Capital, LLC (Angelo A. Stio, III, of counsel and on the brief; Avrohom C. Einhorn, on the brief).

PER CURIAM

Siblings Chana and Benjamin Ringel[1] own numerous properties through various holding companies. For many years, they have disagreed on the management of the properties, resulting in protracted litigation. This action concerns a dispute between plaintiffs Chana and CR Lakewood, a limited liability company with Chana as the sole member. Defendants are Benjamin and BR Lakewood, a limited liability company with Benjamin as the sole member. CR Lakewood and BR Lakewood are fifty percent owners of BCR Lakewood Holdings, LLC, jointly managed by Chana and Benjamin. BCR Lakewood serves as a holding company for five single-asset subsidiary entities, each owning one of five properties located in Lakewood.

Chana brought a derivative action on behalf of BCR Lakewood alleging Benjamin was making unilateral decisions regarding the entity that negatively affected Chana and CR Lakewood. Plaintiffs sought injunctive relief to enjoin Benjamin from further harming BCR Lakewood and to compel the sale or dissolution of the entity.

During the trial, the parties reached a settlement. They agreed to split four of the five BCR Lakewood properties. The fifth property, Pinewood, would be disposed of through a public sale. After plaintiffs drafted a term sheet,

---

[1] Because the parties share a surname we refer to them by their first names.

defendants disputed its terms and moved to enforce what they believed to be the original settlement agreement. The trial court granted defendants' motion and ordered the public sale. After additional motion practice by both parties, the trial court issued an order and statement of reasons regarding the settlement agreement. The parties thereafter executed the agreement, which stated in pertinent part:

> The [p]arties agree to sell the Pinewood Complex to a third party purchaser or to either Chana Ringel or Benjamin Ringel, solely or in partnership or conjunction with any person or entity, via an arm's length sales process ("Sale Process") intended to maximize the value of the Pinewood Complex, to be brokered by a mutually acceptable real estate broker (the "Broker") pursuant to a listing agreement with the Broker in a form mutually acceptable to the [p]arties. . . . The Sale Process shall provide for the sale of the Pinewood Complex to the highest bidder pursuant to a binding agreement without any contingencies to closing including without limitation any due diligence or mortgage contingency. The proceeds of such sale (net of any customary closing costs, apportionment of Property Expenses, and out of pocket costs and expenses associated with the sale incurred by, or payable to, the Broker) shall be split equally between the CR Parties and the BR Parties, subject to the amount to the $2.5 million of escrowed funds from each side ($5 million in total). In the event of such contingency, the [p]arties agree to fully cooperate with the sale of the Pinewood Complex, including signing all necessary documents, facilitating access to the Pinewood Complex to the Broker, other brokers, and prospective buyers, and promptly providing or authorizing the

4

> provision of such financial and other information as may be requested by prospective buyers. The [p]arties shall have no discretion over the terms and consideration of any sale by the Broker other than that such sale shall comply with this provision of the Sale Process.

(emphasis added.)

The parties were permitted to bring any dispute to the court regarding the sale. The trial court retained jurisdiction to implement the terms of the agreement.

The parties agreed on Joseph Brecher as the broker for the public sale. After a first round of bids, a second round occurred which was to be the best and final round. The highest bidder in the second round was Rushmore Capital. AJH Management's bid was the fourth highest, coming in over $1,000,000 less than Rushmore's bid.

Brecher conducted a third round of bids because he

> was approached by . . . a partner of AJH . . . and said that he was going to be partners with AJH if they were successful in buying this property . . . and he thinks they can be much more aggressive than their best and final. . . . and they were willing to really go extremely aggressive on this a lot more than they did in their best and final.

Rushmore Capital again had the highest bid at $45,625,000. The second highest bid—$45,500,000—came from AJH. Because Rushmore was the highest bidder, Brecher awarded it the sale of Pinewood.

5

In May 2021, plaintiffs sought the court's approval of the sale of Pinewood to Rushmore, stating defendants had "not agreed to send the [sale] contract and . . . instead propos[ed] a further process that w[ould] result in further delays of the sale of the property." In response, defendants contended that Brecher had a conflict of interest with Rushmore that required the disqualification of the bid. AJH also emailed Brecher with another bid—$45,800,000—the highest bid to date.

Defendants filed an order to show cause requesting the court accept AJH's bid as the highest, or alternatively, order a bid-off between the two highest bidders, and order Brecher to disclose his relationship with Rushmore should Rushmore be involved in the bid-off. Plaintiffs cross-moved for an order selling Pinewood to Rushmore.

On June 4, 2021, the court heard the motions and issued an oral decision and accompanying order. During the hearing, Brecher testified regarding his family's investments in properties either owned by Rushmore or properties in which Rushmore had an interest. In addressing defendants' assertion that Brecher had a conflict of interest, the judge found Brecher's wife and brother-

6

in-law[2] had interests in several properties (apartment complexes) with which Rushmore also had a connection. The judge noted that Brecher was not the broker in any of the deals and that "he was one of hundreds of limited partners and that he made no decisions based on that relationship." The court concluded there was no conflict of interest and no reason to disqualify the broker or the bid on those grounds.

Brecher also testified regarding his communications with the bidders seeking final and best bids. Brecher admitted that while there was an original offering memorandum, there was no "written advice to potential purchasers that there was a highest and best due date." He stated that he orally informed each bidder there was going to be "a second round of bidding and if there was any information they needed . . . that we would have a best and final." Brecher conceded he never told the bidders in writing or in the bid package that the final and best offers were due on a certain date.

In considering the bidding, the court found that the lack of a written contract violated the statute of frauds. And there was no clear and convincing evidence to establish an oral contract with any of the bidders. Therefore, the

---

[2] Brecher also testified that his son-in-law had previously worked for Rushmore as a property manager but had resigned from the position prior to the bid award.

A-0370-21

court rejected the bids and ordered Brecher to conduct a new bidding process with certain specified conditions.

The bids were received in the manner prescribed by the judge. The results were: Rushmore at $47,100,000; GM Equities at $46,500,000; BR Lakewood at $46,391,000; and AJH at $46,300,000. Court-appointed counsel overseeing the process informed the parties that Rushmore was the highest bidder.

The same day, defendants wrote to the court stating that BR Lakewood was the highest bidder and requesting a conference. Plaintiffs subsequently filed an order to show cause seeking a declaratory judgment that Rushmore was the highest bidder. Defendants cross-moved for an adjudication that BR Lakewood was the highest bidder. Rushmore moved to intervene.

On August 23, 2021, the court heard arguments on the motions. The court granted Rushmore's motion to intervene.

Plaintiffs argued Rushmore was the highest bidder because the settlement agreement was clear and unambiguous and contract interpretation law required the court to find the highest bid is determined by the highest offered purchase price. Defendants contended the parties' intent in the settlement agreement was to make the property as profitable as possible by accepting the bid that netted the parties the highest profit. Defendant asserted that the ramifications of the

New Jersey State Transfer tax and the broker's commission on the BR Lakewood bid netted the parties a higher profit. Plaintiffs contested defendants' calculations.

In an oral decision, the court found the term "highest bidder" was clear and unambiguous and Rushmore submitted the highest bid. The court stated the settlement agreement did not entail taking into consideration the effects of any taxes or fees prior to a determination of the highest bid. In addition, the bidders were not informed that the highest bid would be calculated using a certain tax rate or a calculation of net proceeds. The court granted plaintiffs' motion in an August 25, 2021 order and denied defendants' cross-motion on August 23, 2021.

On appeal, defendants contend the court erred in declaring Rushmore the winning bidder because the "highest bidder" refers to the bidder whose offer yields the maximum sales proceeds to the sellers. Defendants also assert the court erred in denying its motion to disqualify Brecher because they established he had a conflict of interest.

We apply a deferential standard in reviewing a trial judge's factual findings. Balducci v. Cige, 240 N.J. 574, 594-95 (2020); Cesare v. Cesare, 154 N.J. 394, 411-12 (1998); Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974). A trial judge's findings will be binding on appeal so long as they

A-0370-21

are supported by "adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12. However, a "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

We begin by addressing defendants' contention regarding the meaning of the "highest bidder" in the parties' settlement agreement. "A settlement agreement between parties to a lawsuit is a contract, governed by the general principles of contract law." Savage v. Twp. of Neptune, 472 N.J. Super. 291, 305 (App. Div. 2022) (alterations and citations omitted). We review the interpretation of a contract de novo. Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011) (citing Jennings v. Pinto, 5 N.J. 562, 569-70 (1950)); Manalapan Realty, L.P., 140 N.J. at 378.

The "basic tenet of contract interpretation is that contract terms should be given their plain and ordinary meaning." Kernahan v. Home Warranty Adm'r of Fla., Inc., 236 N.J. 301, 321 (2019) (citations omitted). While the touchstone of contract interpretation is for a court to determine the intention of the contracting parties, "[i]t is not the real intent but the intent expressed or apparent in the

writing that controls." Garfinkel v. Morristown Obstetrics & Gynecology Assocs., 168 N.J. 124, 135 (2001) (alteration in original) (citations omitted). Thus, one party's intention concerning the meaning of a contract provision, when secret and not expressed in the contract itself, is immaterial and inadmissible, and cannot serve to vary the contract's terms. See Domanske v. Rapid-Am. Corp., 330 N.J. Super. 241, 246 (App. Div. 2000); see also Brawer v. Brawer, 329 N.J. Super. 273, 283 (App. Div. 2000) (holding that the fact that a contracting party "has a different, secret intention from that outwardly manifested" is immaterial) (citations omitted).

A court should enforce a contract based on the parties' intent, the contract's express terms, and the surrounding circumstances and purpose of the contract. Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 226 N.J. 403, 415 (2016) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)). But when "the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect." Ibid.

The trial court concluded that the term "highest bidder" was clear and could be interpreted using its plain language because the settlement agreement did not indicate that the parties or buyers were to consider any transactional taxes or fees. The agreement did not include an instruction for the calculation

11

of net proceeds. Furthermore, accepting defendants' interpretation would complicate the process as the buyers' and seller's tax situation were different, and the parties intended the sale process to be simple, not complex. As the court stated, defendants' interpretation "undercuts" and "destroys" the parties' intention of a "clear, transparent, and easy process."

We see no error in the trial court's finding that the parties intended the term "highest bidder" to mean the face value of the bid, and not the net proceeds that would result from the bid. The plain, commonly accepted meaning of "highest bidder" is who offers the greatest price for the property. The settlement agreement stated Pinewood should be sold "to the highest bidder pursuant to a binding agreement." The agreement also directed the dispersal of the sales proceeds, stating "[t]he proceeds of such sale (net of any customary closing costs, apportionment of Property Expenses, and out of pocket costs and expenses associated with the sale incurred by, or payable to, the [b]roker) shall be split equally between the" parties.

In addition, the agreement also referred to taxes and instructed the parties to "cooperate with each other in good faith and in a timely manner to take advantage of any tax savings or tax deferral strategies to maximize realization of the value of" Pinewood.

12

The inclusion of these provisions in the agreement defeats defendants' argument. Furthermore, the clauses relied on by defendants refer to post-bid procedures and are not related to the bidding process. There was no instruction to the bidders to consider any tax ramifications. Nor did potential bidders have the necessary information to make that financial decision. They were informed instead to make their best bid. Rushmore was the highest bidder as defined under the parties' settlement agreement.

We turn to defendants' assertion that the trial court erred in refusing to disqualify Brecher. The court heard Brecher testify regarding his family relationships with various entities and made factual findings. We discern no reason not to defer to those findings.

Furthermore, Brecher was not acting in a quasi-judicial capacity as defendants contend. See Starr v. Reinfeld, 267 N.J. Super. 25, 31 (App. Div. 1993) (quoting Levine v. Wiss & Co., 97 N.J. 242, 250-51 (1984)) (To determine if a person is working in a judicial or quasi-judicial capacity, the person must be able to "exercise . . . discretionary judgment" similar to a judge or arbitrator).

Brecher was selected by the parties. His authority arose out of the parties' settlement agreement. He did not resolve any conflicts between the parties or determine legal rights. He simply used his specialized skill as a broker,

13

specifically in the Lakewood area dealing with properties worth tens of millions of dollars, to find potential buyers for Pinewood. He then sent the potential buyers information regarding the bidding process. After the bids were completed, the court-appointed attorney managed the sale. Defendants have not demonstrated any error in the judge's decision to deny the disqualification of Brecher.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION